**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No.: 3:16-CR-00051-BR-26 |
| Plaintiff, | |
| vs. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **JAKE RYAN, et al.,** | |
| Defendants. | |

Jake Ryan will appear in front of the Court for sentencing on December 12, 2017, having

been found guilty of Count Six of the Superseding Indictment and Counts One and Three of the

Misdemeanor Information. The probation office recommends a sentence of probation with 8

months home confinement. Mr. Ryan asks the court to impose a sentence of probation without a

home confinement condition as that sentence would be "sufficient, but not greater than

necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. §

3553(a). A probationary sentence complies with this Court's "overarching duty" laid out in §

3553(a). *Pepper v. United States*, 131 S.Ct. 1229, 1242 (2011).

To appreciate how the proposed probation sentence complies with the Court's mandate, this Court must understand the "history and characteristics of the defendant," as "the punishment should fit the offender and not merely the crime." *Id.* at 1240 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

### § 3553(a)(1): History and Characteristics of the Defendant



*Jake Ryan on the first day of trial*

Mr. Ryan is 28 years old. He lives with his parents in Plains, a small town in Sanders County, Montana. Mr. Ryan's family has a long history of lawful political activity in Sanders County: canvassing for local political candidates, attending mundane planning meetings on matters important to them, and participating in small local rallies. The Ryan family is also active in purely charitable events: helping with veteran benefits and putting on the Plains Day dance each June. Jake Ryan has always helped out with these efforts, never as a vocal leader, but always willing to show up and support causes he believed in wherever he felt his help was needed.

Prior to the events at issue in the present case, Jake Ryan had never been arrested or cited with any offense. His arrest in this case was the first time he had ever been in handcuffs; the first

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

time he had ever been in the back of a police car; the first time he had ever seen the inside of a jail. Mr. Ryan was released in June 2016 after spending two months in jail. Since his release, he has not given either the Court or the probation office any reason to question whether he should be continued on release. At trial, the sheriff of the county where he lives, Sanders County Sheriff Tom Rummel, testified that Jake Ryan was the least of his worries of anyone in Sanders County.

Mr. Ryan does not now, nor has he ever, exhibited any type of anti-social behavioral issues that are commonly seen in criminal defendants. On the contrary, his interests are decidedly pro-social. While he helps out with his family's political activities, Mr. Ryan's personal passion is acting; he donates hundreds of hours of his time to the production of community and school theater plays. The theater directors he has worked for describe him as an uber-volunteer—willing to do anything necessary to get the production off the ground, whether that involves building the sets, taking roles no one volunteered for, or staying late to help a child learn his lines.



*Jake Ryan (L) in costume as Iago for a community production of Aladdin, with theater director Rita Tingey (R)*

Mr. Ryan particularly enjoys dance, teaching high school students traditional dances as part of the Plains Day dance his family hosts every year, and other events through the schools and his church throughout the year.

Page 3 – DEFENDANT'S SENTENCING MEMORANDUM



To support his artistic passions, Mr. Ryan maintains employment in manual labor jobs, including construction, ranch work, and rock quarries. Currently, he is employed working in a rock quarry, selecting and removing rocks suitable for landscaping to sell on the wholesale market.

### § 3553(a)(1): Nature and Circumstances of the Offense

This Court presided over two jury trials, voluminous pretrial litigation, and several sentencing hearings. It is well acquainted with the background circumstances that led to Mr. Ryan's offense. This section will merely summarize the evidence presented at trial as to Mr. Ryan's particular involvement.

Mr. Ryan went to the refuge on January 16, 2016, a Saturday, two weeks after the occupation began. He made the decision to go at the last minute, joining his father, a family friend, and two brothers on a trip to deliver basic supplies gathered from the Plains community to the group at the refuge. They entered the refuge from the east, avoiding the town of Burns. That

weekend, the refuge was quiet with relatively few people around. There was no media, no conspicuous militia groups displaying weapons, and Ammon Bundy was home visiting his family. The occupation was presented as a peaceful protest against federal government overreach, and the occupiers made clear that they needed help from young, able-bodied people. By the end of the weekend, when his family was ready to return to Montana, Jake Ryan made the decision to stay on his own. He was attracted to the feelings of comradery and purpose he found on the refuge.

Mr. Ryan did not have a way to get home if and when he decided to leave. The refuge is a ten-hour drive from Plains in good weather. Mr. Ryan did not then, and has never, owned a cell phone. He did not have much money with him, and did not know anyone there who lived in his area of the state.

To say that Mr. Ryan was not one of the leaders on the refuge would be an enormous understatement. Dozens of people had greater roles than he did who were never even charged in this case. The government presented almost no evidence about what Mr. Ryan did for the ten days he was there because they have no idea what he did beyond what Mr. Ryan has admitted through counsel. During the ten days he spent at the refuge, Mr. Ryan was photographed exactly twice, despite the enormous amount of photos and videos that exist from that time. He was photographed at the field station, by Craig Miller, being confronted by Marilyn Miller, and he was photographed in the firehouse, listening to Ammon Bundy give a lecture. He never travelled to Burns and did not participate in any of the media events. In short, were it not for his actions on January 27th, law enforcement would have no idea he was even ever there, and they would not have cared if they found out.

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205



*The two photographs of Jake Ryan during the occupation*

The Court heard testimony and viewed video evidence of the chaos created on the refuge by the shooting of LaVoy Finicum and the arrest of the occupation leaders on January 26. Mr. Ryan's choice during that chaos is clearly presented in government's exhibit 402. He did not have a vehicle with him to make his own path out. He had to choose whether to follow Blaine Cooper in a convoy of vehicles loaded with people prepared to "lay down lead" on law enforcement and engage in guerrilla tactics from the hills of Idaho, or to stay with Jason Patrick and continue, as Mr. Patrick put it, "to continue the peaceful protest." Mr. Ryan chose the latter.

Mr. Ryan spent the entire night of January 26 alone, awake in the watch tower. He came down from the tower at first light, when he could see others beginning to gather in the parking lot, around the Andersons. The decision that led to his prosecution occurred that morning, shortly after the media pulled out, and is captured on government surveillance video. In government's exhibit 132, the excavator is off, next to a large hole in the ground. Duane Ehmer comes back from the refuge buildings, having determined that the cable he hit was not an electric cable. Mr. Ehmer and others look at the hole, have some conversation, and then Mr. Ryan walks in from the direction of the refuge buildings as Mr. Ehmer is leaving. Mr. Ryan then gets in the cab of the

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

excavator and begins digging what are now referred to as trenches one and two. Once he begins

the task, he works diligently until it is complete. In the videos where Sean Anderson is talking

bravado and firing his rifle at a manned FBI aircraft, Mr. Ryan is in his own little world.

Logic cannot explain why Mr. Ryan dug those trenches, but neither can malice. The

trenches were plainly designed to afford some sort of protection to the remaining people on the

refuge, but they were also plainly useless to fend off a government assault involving armored

vehicles, aircraft, and trained soldiers. The reason Mr. Ryan dug them is simple and

unremarkable—it was a job that someone else decided was necessary. Mr. Ehmer started the job

but messed it up by hitting a cable, so Mr. Ryan, as the only other person there who knew how to

operate the equipment, volunteered to finish it. It gave him something to do and made him feel

useful when he was in a position of great powerlessness. Had he known the pain it would cause

to the Burn Paiute people, he never would have done it.

That night Mr. Ryan was finally shown the opportunity for a third way out that was not

presented to him on the night of the 26th. Through the efforts of Barbara Berg, the FBI negotiator

team, and Mr. Ryan's family, he was shown the opportunity to simply walk off the refuge and go

home. Although that opportunity was extended to every remaining person on the refuge with the

exception of Sean Anderson—Sandy Anderson, David Fry, and Jeff Banta—Jake Ryan alone

walked out. He surrendered to the FBI and was picked up by his father and brought home to

Plains.

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205



*Jake Ryan surrendering to the FBI*

### § 3553(a)(2): Achieving the Purposes of Sentencing

As the Supreme Court stated in *Pepper*, the "sentencing judge's overarching duty under § 3553(a) [is] to 'impose a sentence sufficient but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." 562 U.S. at 491. Those purposes are "the need for the sentence imposed--"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a)(2).

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

A.    Just Punishment

Purpose (A) requires criminal sentences to comply with directives beyond the practical needs reflected in (B) through (D) (reflecting the goals of deterrence, incapacitation, and rehabilitation). Purpose (A) is a clear invocation of the need for the law to act as a moral guide, punishing wrongdoing in correlation with the moral culpability of the wrongdoer. This is the same principle underlying the proportionality principle of the Eighth Amendment. *See Ewing v. California*, 538 U.S. 11, 31, 123 S. Ct. 1179 (2003) (J. Scalia, concurring). In that sense, it is impossible to determine what punishment is "just" without taking a hard look at the state of mind of the defendant at the time of the crime.

The government has argued throughout these proceedings that the crime of damaging government property would not be so serious were it not for the circumstances under which the crime was committed. If, for example, some drunken teenager decided to joy ride the government's excavator and dig these trenches for nothing but the thrill of it, that this person would be less culpable than Mr. Ryan. This runs contrary to basic principles of justice and culpability. The Court disallowed Mr. Ryan from presenting a self-defense defense to the charge, concluding that no reasonable person could be believe that he was about to be subject to the imminent use of force. Even accepting that conclusion for the purposes of sentencing, it is still undeniable that Mr. Ryan did not damage government property for his own profit, he did not damage the land in order to insult the native people's heritage or their ancestors, he did not damage the land just for the thrill of it, he did it because he believed it would help to preserve life. However misguided we may see this belief in retrospect, Mr. Ryan had no other motivation in digging those trenches.

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

The decision Mr. Ryan made that led to his prosecution was made having not slept for over 24 hours, still reeling from the trauma of learning that Mr. Finicum had been shot and killed, and under the influence of a group of people that was severely lacking any level-headed leaders. Compared with a hypothetical individual who committed the same crime with no justification, Mr. Ryan is less culpable, not more. If, for example, Mr. Ryan had decided to take the excavator and demolish the buildings on site simply to demonstrate his anger at the federal government, surely that would be demonstrative of an individual more deserving of punishment.

The government recognized this exact principle in justifying a sentence of one year probation and a $1000 fine for Sean Anderson, stating at his sentencing hearing, "He should not be judged by those moments when he was under stress at the end of the occupation itself." If justice recognizes the stress of that moment in mitigating Mr. Anderson's conduct of firing at a manned aircraft and encouraging an armed uprising against the United States government, surely a rational system of justice would view Mr. Ryan's conduct of digging a hole similarly mitigated.

B.      Deterrence

Counsel does not expect either the Government or the Probation Office to argue that a long sentence (or any sentence) is necessary to deter Mr. Ryan from committing a crime in the future. Mr. Ryan has never committed any crimes in the past, and likely would have gone his whole life without committing any crimes were it not for the unique circumstances he found himself in on January 26, 2016.

With regard to general deterrence, a recent wave of scholarly interest has failed to identify any relationship between harsh punishment for crimes and any deterrent effect in the community. *See, e.g.,* Nat'l Research Council, Nat'l Academy of Science, *The Growth of*

*Incarceration in the United States: Exploring Causes and Consequences* 134-40, 337 (2014) (concluding that "insufficient evidence exists to justify predicating policy changes on the general assumption that harsher punishments yield measurable deterrent effects"); Brennan Center for Justice, *What Caused the Crime Decline* 4, 15, 25 (2015) (concluding that since 2000, incarceration has had nearly zero effect on reducing violent crime and property crime). Even the Department of Justice's National Institute of Justice concluded that "Increasing the severity of punishment does little to deter crime." *See Five Things About Deterrence*, available at: https://nij.gov/five-things/pages/deterrence.aspx.

C.    Incapacitation

At Mr. Ryan's detention hearing in April 2016, the government urged the court to detain Mr. Ryan as a flight risk, claiming that, if he was released, "law enforcement is unlikely to find him again." The government further claimed that releasing him posed a "danger, not only to the community, but specifically a danger to law enforcement." Since his release in June 2016, Mr. Ryan emphatically proved the government wrong. He has proven that he is willing and able to live in the community subject to conditions set by the court, and there is no need to keep Mr. Ryan in a cage in order to protect anyone, including law enforcement. None of that should be surprising, as it is perfectly consistent with social science research on risk.

In the modern focus of reducing recidivism through a "risk-need-response" model, researchers have identified a "central eight" category of risk and needs factors that are the "major causal variable[s] in the analysis of criminal behavior in individuals." Nathan James, Congressional Research Service, *Risk and Needs Assessment in the Criminal Justice System* 8 (Oct. 2015). Those central eight are: history of antisocial behavior, antisocial personality pattern, antisocial cognition, antisocial associates, family/marital circumstances (poor quality

relationships), school/work (low levels of performance), leisure/recreation (low levels of involvement), and substance abuse. *Id*. Mr. Ryan possesses none of these risks.

D.    Needs of the Defendant

No one has identified any needs that Mr. Ryan has that may be satisfied in a correctional setting.

## § 3553(a)(4): Sentencing Guidelines Calculation

The Guidelines are advisory only.  They are one factor among many to be considered in fashioning an appropriate sentence.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38, 49–51 (2007); *United States v. Booker*, 543 U.S. 220, 245 (2005). Moreover, the Guidelines are "not to be presumed reasonable," and are to be given no more weight than any other factor listed in 18 U.S.C. § 3553(a).  *Nelson v. United States*, 555 U.S. 350, 352 (2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*).  *See also Rita v. United States*, 551 U.S. 338, 351 (2007) ("the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"); *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007) ("ultimately [the court] must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence"). However, the Court is required to properly calculate what sentence the guidelines recommend. *Carty*, 520 F.3d at 991.

There is only one dispute between the parties regarding the appropriate sentencing guidelines calculations: whether Mr. Ryan should get credit for acceptance of responsibility under §3E1.1. The remainder of the guidelines questions are agreed upon. It is counsel's understanding that the government is no longer seeking an enhancement under USSG §3A1.4, Application Note 4 based on the Court's ruling in Mr. Ehmer's sentencing hearing. Nevertheless,

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

because Mr. Ryan's response to that argument was already written, and because the probation office is recommending the enhancement, Mr. Ryan's response is included below.

A.    Application Note 4

The government argues for a three-level enhancement under USSG §3A1.4, Application Note 4. One of the arguments they make in support of this enhancement has no bearing and ought to be rejected out of hand: that because other defendants, who pled guilty to the § 372 conspiracy charge which Mr. Ryan was acquitted of, stipulated to the enhancement, that this somehow leads to the necessity of applying the enhancement to Mr. Ryan over his objection. The government uses the language of "unwarranted disparity," but avoiding unwarranted disparities is not part of the guidelines calculation. This is more of an argument for a variance from the guidelines than a departure. Moreover, it is simply illogical. The other defendants were not even convicted of the same crime, and no one contested the application of the enhancement.

The other argument the government makes attempts to apply the facts underlying the conviction to the language of Application Note 4. The Court rejected this argument when the government made it in Mr. Ehmer's sentencing hearing, and the Court ought to do so again here.

Application Note 4 states, in pertinent part: "[T]here may be cases in which … the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote [an offense other than a federal crime of terrorism]." At the outset, it is worth noting that whether to apply Application Note 4, if the facts support it, is still discretionary with the Court. The entire note is written in permissive rather than mandatory language. In other words, while it may be error to apply an enhancement if the facts do not support it, it will not be error to refuse to apply the enhancement even when the facts support it. In this case, the facts do not

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

support the enhancement. Mr. Ryan did not dig those trenches in order to intimidate, coerce, or

retaliate against the government. The government has not introduced any evidence to support any

of those motivations, and the reasonable inferences that can be drawn from the facts introduced

at trial do not support any such intent. The government has already tried and failed to prove this

intent twice; it should not be permitted a third try.

At trial, the government accused Mr. Ryan and Mr. Ehmer of conspiring to impede

federal officers by "force, threats, or intimidation." The jury, while apparently believing that

such a conspiracy did exist, nonetheless acquitted Mr. Ryan and Mr. Ehmer of that conspiracy.

Presumably, if the jury believed what the government asserts now, that the trench was dug in an

effort to coerce or intimidate federal officers, they would have convicted Mr. Ryan and Mr.

Ehmer. At Mr. Ehmer's sentencing hearing, the government then tried to convince the Court that

Mr. Ehmer and Mr. Ryan dug the trench in order to intimidate or coerce government conduct.

The Court found that the government had failed to meet their burden and declined to apply

enhancement.

There is no more evidence available to the Court now then was available to the jury at

trial or the Court in Mr. Ehmer's sentencing hearing. Consistent with the principles underlying

the Double Jeopardy Clause, collateral estoppel, and basic fairness, the Court should again

decline to apply the enhancement.

B.    Acceptance of Responsibility

Mr. Ryan requests that the Court find that he is entitled to a two-level reduction under

§3E1.1 for acceptance of responsibility. Application Note 2 states in full:

> This adjustment is not intended to apply to a defendant who puts the government
> to its burden of proof at trial by denying the essential factual elements of guilt, is
> convicted, and only then admits guilt and expresses remorse. Conviction by trial,
> however, does not automatically preclude a defendant from consideration for such

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

USSG §3E1.1, Application Note 2. Mr. Ryan has never denied responsibility for digging the trenches. In his opening statement at trial, he told the jury that he dug those trenches. He stipulated pretrial to the jurisdictional element of the amount of damage. Mr. Ryan's position at trial was simply that his motivation in digging the trenches meant that he was not criminally culpable. In other words, he was making "a challenge to the applicability of a statute to his conduct." Therefore, Application Note 2 specifically contemplates that he should be entitled to a reduction for acceptance of responsibility.

His pretrial conduct is also consistent with acceptance of responsibility. Within a very short time of being arrested, Mr. Ryan made clear to the government that he would plead guilty to Count 6, and that he was willing to be creative in coming up with a punishment that would make the tribe feel whole or give them some semblance of restorative justice. He only wanted to avoid the lifelong consequences of a felony conviction. The government flatly rejected the overture. After the acquittal of the round one defendants, the government presented misdemeanor offers to Sean Anderson, Sandy Anderson, Dylan Anderson, and Darryl Thorn. Again, Mr. Ryan told the government that he would plead guilty to a misdemeanor without hesitation, and that he was open to whatever might help the tribe feel whole when it came to punishment. Again, the overture was rejected.

Mr. Ryan's proposed sentencing guidelines calculation is:

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

| Base Offense Level §2B1.1(b) | 6 |
|---|---|
| Loss Amount §2B1.1(b)(1)(D) | +6 |
| Specific Offense Characteristics §2B1.1(b)(15) | +2 |
| Acceptance of Responsibility §3E1.1 | -2 |
| Total Offense Level | 12 |

### § 3553(a)(6): Avoiding Unwarranted Disparities

As discussed above, the role the guidelines play in determining the appropriate sentence for any given defendant has decreased significantly over the past ten years. The cases discussed above, which cautioned district judges from viewing guidelines sentences as "presumptively reasonable" or even anything more than one of the factors to consider, were cases that are common in federal district courts. In cases such as drug distribution, immigration crimes, white collar crimes, and weapons crimes, the facts of the cases tend to repeat themselves, as do the circumstances that led the defendants to commit the crimes. In those cases, having guidelines to give some semblance of nationwide uniformity to the enforcement of federal criminal laws has natural appeal. That natural appeal is lacking in a case like this one.

It is a legitimate question to ask whether the guidelines calculation should have any real bearing on the appropriate sentence under § 3553(a) in a case as unique as this one. The Sentencing Commission did not study the issue of protests gone wrong that end up inadvertently damaging cultural resources when it came up with the guidelines under §2B1.1. There was not a host of similar cases to look to and consider different factors that should lead to greater or lesser sentences. There's no long history that has led to consistent problems they identified and corrected for. Instead, Mr. Ryan is simply being lumped in with people who commit crimes

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

primarily out of greed or simple malice. The guidelines treat him the same as someone who

steals out of greed or damages property for the thrill of it. Nevertheless, even among those

individuals, the district courts nationwide impose sentences below the guidelines more than half

of the time. *See Quick Facts: Theft, Property Destruction, and Fraud Offenses*, available at:

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

facts/Theft_Property_Destruction_Fraud_FY16.pdf. The average variance for non-government

sponsored below guidelines sentences is 55.2%. *Id*. Therefore, even accepting that Mr. Ryan's

crime is in some way equivalent to a typical §2B1.1 crime, the variance requested here would not

create any disparity at all, much less an unwarranted one.

Imposing a sentence of imprisonment would create an unwarranted disparity for Mr.

Ryan among the other individuals sentenced in this case. The government argues that, although

Mr. Ryan was acquitted of the conspiracy charge, the Court still must consider his "conduct in

the context of the occupation itself." If that is true, then shouldn't Mr. Ryan also get the benefit

of his sentence being considered in comparison to the other defendants in this case who have

already been sentenced? If Mr. Ryan had pled guilty to the conspiracy charge, he surely would

have qualified for a minimal role adjustment and the government would have readily agreed to a

probationary sentence. Far more culpable defendants have already received probationary

sentences. In the context of the occupation, Jake Ryan is one of the least culpable people

charged. A sentence of imprisonment for Mr. Ryan can only be understood as a punishment for

his exercise of his right to trial by jury.

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

## **Conclusion**

A sentence of probation is the just and appropriate sentence in this case. It complies with the mandate of § 3553(a) and Mr. Ryan asks the Court to impose probation.

**DATED** this 6th day of December, 2017

By:     /s Jesse Merrithew
**Jesse Merrithew**, OSB No. 074564
Attorney for Jake Ryan

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205